Kathleen E. Brody (Bar No. 026331)
Darrell L. Hill (Bar No. 030424)
ACLU Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: 602-650-1854
kbrody@acluaz.org
dhill@acluaz.org

Daniel C. Barr (Bar No. 010149)
Alexis E. Danneman (Bar No. 030478)
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: 602.351.8000
Facsimile: 602.648.7000
DBarr@perkinscoie.com
ADanneman@perkinscoie.com
DocketPHX@perkinscoie.com

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| J'aime Morgaine, Paul Hamilton, | No.: |
| Plaintiffs, | |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| United States Congressman Paul Gosar, | |
| Defendant. | |

## I.   PRELIMINARY STATEMENT

1.     This case arises from United States Congressman Paul Gosar's repeated infringement of Plaintiffs' First Amendment rights. Defendant has chilled and infringed on Plaintiffs' right to express opposing viewpoints in online public forums by blocking Plaintiffs from participating in forums hosted on Defendant's official Facebook page, deleting Plaintiffs' comments that express viewpoints critical of Defendant's political views, and using Facebook's spam filtering system to target members of the public who express opposing opinions. Plaintiffs bring this action to defend their right to engage in protected speech in government-created online public forums.

2.     When a government official creates an online public forum for constituent expression, the First Amendment prohibits the official from banning persons or censoring comments that express opposing or critical viewpoints. When a government official uses social media to offer responsive services or dialogue with constituents in his or her official capacity, the First Amendment requires the official to provide all persons an equal opportunity to petition the government for redress. And when a government official uses social media to make government information and services generally available, the First Amendment prohibits banning constituents in a manner that prevents them from having equal access.

3.     Defendant Rep. Gosar's policies and practices on his official social media accounts violate Plaintiffs' First Amendment rights and chill Plaintiffs' present and future exercise of those rights. Judicial intervention is required to end Defendant's ongoing violation of Plaintiffs' constitutional rights.

## II.   JURISDICTION AND VENUE

4.     This Court has original jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

5.     The Court may grant declaratory and injunctive relief for the constitutional violations alleged here under 28 U.S.C. §§ 2201(a) and 2202, and/or Federal Rules of Civil Procedure 57 and 65.

6.     Venue is proper in the United States District Court for the District of Arizona pursuant to 28 U.S.C. § 1391(b) and (e) because the events giving rise to the instant claim occurred within Arizona and Plaintiffs and Defendant reside in Arizona.

### III.    Plaintiffs

7.     Plaintiff J'aime L. Morgaine is a resident of Kingman, Arizona, a founder of Indivisible Kingman, and a current constituent of Representative Paul Gosar.

8.     Plaintiff Paul Hamilton is a resident of Prescott, Arizona, a founder of Indivisible Prescott, and a current constituent of Representative Paul Gosar.

### IV.    Defendant

9.     Defendant United States Congressman Paul A. Gosar is the elected representative for the fourth congressional district of Arizona. Rep. Gosar has ultimate authority to approve the policies and practices that are challenged in this case and that were applied to deprive Plaintiffs' constitutional rights. Rep. Gosar is being sued in his official capacity.

### V.    Summary of Facts

#### A.    Defendant's Facebook Page is a Public Forum.

10.     Facebook is an online social media platform with approximately 1.94 billion monthly users worldwide, including approximately 234 million individual users in the United States and Canada.

11.     Facebook users may post messages, photos, and videos on the website, respond to or share others' messages, photos, and videos, and interact with other Facebook users in relation to those posts. Facebook contains several features to promote dialogue, sharing, and communication between users.

> a.     Each Facebook user has a personal page that the user may design according to his or her preferences. Facebook privacy settings allow users to regulate who may or may not view their pages, who may or may not comment on their pages, and who may or may not follow their pages.[1]

---

[1] *Basic Privacy Settings and Tools*, FACEBOOK.COM,

b. A *status update* is a post on a user's Facebook page that is shared with a Facebook user's friends or the public, depending on the user's privacy settings. These posts may contain written messages, links to other websites, photos, and videos.

c. Facebook users may post replies to other users' status updates. Replies appear under the status update among other users' replies and can be seen by other users who have access to the original post. Facebook users may also *react* to posts using graphics without posting their own comment.

d. Facebook users may broadcast live video to the public or their followers using the Facebook *Live* feature.[2] Videos may be saved to the Facebook user's page and viewed after the broadcast has ended.

e. Facebook users have the ability to *ban* or *block* other users from their page. When a user is blocked from a public page on Facebook, all his or her previous comments to the page are hidden, and the blocked user loses the ability to publish to that page, react to posts on that page, or follow that page in his or her timeline. The process for, and consequences of, blocking a user are explained in Facebook's Help Center.[3]

f. Facebook users may report or mark other user's comments to their Facebook pages as "spam." Facebook defines spam as "contacting people with unwanted content or requests," including "sending bulk messages, excessively posting links or images to people's timelines and sending friend requests to people you don't know personally."[4]

12. Rep. Gosar owns and operates an official, public Facebook page entitled "Congressmen Paul Gosar D.D.S." Exhibit A, screenshot of Congressman Gosar's official

---

https://www.facebook.com/help/325807937506242 (last visited April 9, 2018).
[2] FACEBOOK LIVE (April 9, 2018), https://live.fb.com.
[3] *Blocking People*, FACEBOOK.COM, https://www.facebook.com/help/290450221052800 (last visited April 9, 2018).
[4] *Spam*, FACEBOOK.COM, https://www.facebook.com/help/287137088110949 (last visited April 9, 2018).

4

Facebook page. Rep. Gosar's Facebook page is "verified," that is, Facebook has confirmed "Congressmen Paul Gosar, D.D.S" is the authentic profile for Rep. Gosar.[5]

13.    Rep. Gosar uses his official Facebook page to converse with the public, to share news and information, to dialogue with constituents, and to allow constituents to dialogue with one another. Visitors to Rep. Gosar's Facebook page are encouraged to express their opinions regarding current news and legislation.

14.    In a November 6, 2013 status update, Rep. Gosar's staff stated that his Facebook "page is meant for the Congressman to share news, photos and interact with people throughout the district and you to share back what you think with him and one another. Rep. Gosar does his best to keep up with messages and the comments left on the page and his staff tries to help when needed." Rep. Gosar uses his Facebook page "to maintain a pleasant, civil forum for the exchange of ideas." Exhibit B, screenshot of Rep. Gosar status update November 6, 2013.

15.    Rep. Gosar's official house website "gosar.house.gov" links directly to his official Facebook page. Exhibit C.

16.    In correspondence to constituents, Rep. Gosar states that he makes "it a point to read emails like yours, *Facebook comments* and good old fashioned mail as much as possible." (emphasis supplied) For "more frequent updates" on Rep. Gosar's congressional activities, he invites constituents to follow his official Facebook, Twitter, or Instagram accounts. Exhibit D.

17.    Rep. Gosar's business cards also direct the public to contact him via social media, including his official Facebook page. Exhibit E.

18.    Rep. Gosar's official Facebook page lists him as a "government official," links to his House website, gosar.house.gov, and includes the phone number for his Washington D.C. office. The "about" section of Rep. Gosar's Facebook page list his current office and political affiliation, "U.S. House of Representatives, Arizona, District 4, Republican," as well as his committee memberships. As of March 22, 2017, Rep. Gosar's official Facebook page was liked by 15,085 Facebook users and followed by 18,452 Facebook users.

---

[5] *What is a Verified Page or Profile?*, FACEBOOK.COM, https://www.facebook.com/help/196050490547892?helpref=popular_topics (last visited April 9, 2018).

19.     "Congressmen Paul Gosar D.D.S." also conforms to the requirements for social media websites of the Members' Congressional Handbook for the 115th Congress, re-adopted December 1, 2017. The Members' Congressional Handbook (hereafter "handbook") is a set of regulations issued to ensure members of the House of Representatives "utilize official resources to support the conduct of the official representation duties on behalf of the district from which he or she is elected."[6]

20.     The handbook specifies that members may use "official funds" to maintain websites on "third-party sites" such as Facebook with the requirement that "Social Media Accounts" are subject "to the same requirements as content on Member websites." *Id* at 33-34.

21.     The handbook requires the URL of official third-party websites to "be recognizably derivative or representative of the name of the Member . . . sponsoring the website." *Id*. at 34. The URL of "Congressmen Paul Gosar D.D.S." is https://www.facebook.com/repgosar.

22.     The handbook specifies the content of a house members' official social media account "must be in compliance with Federal law and House Rules and Regulations applicable to official communications and germane to conduct of the Member's official and representational duties." *Id* at 33-34.

23.     Rep. Gosar also owns and operates the Facebook page, "Paul Gosar for Congress." https://www.facebook.com/DrPaulGosar. Rep. Gosar's campaign page does not conform to Facebook or Congressional requirements for elected representatives, does not link to Rep. Gosar's congressional office, does not prominently specify the defendant is a congressional representative, does not host online town halls, and is not linked to by Rep. Gosar's house.gov website.

24.     Upon information and belief, "Congressmen Paul Gosar D.D.S." is Rep. Gosar's official Facebook page.

---

[6] *U.S. House of Representatives Members' Congressional Handbook*, Committee on House Administration, HOUSE.GOV., https://cha.house.gov/sites/republicans.cha.house.gov/files/documents/member_services_docs/Members%20Handbook%20115th.pdf (last visited April 9, 2018).

25.     Rep. Gosar uses his official Facebook page "Congressmen Paul Gosar D.D.S." to perform government business, to engage with constituents, to make information from the government generally available, to offer responsive services, and to create public forums for constituent dialogue and feedback.

26.     Rep. Gosar regularly hosts "town hall" events on "Congressmen Paul Gosar D.D.S." using the Facebook Live feature. Rep. Gosar invites the public to participate in town halls and Facebook Live events on his official social media pages. Exhibit F, screenshots of town hall invitations on social media.

27.     During online Facebook Live events, Rep. Gosar solicits and answers questions from the public about issues before Congress and matters of public concern, relays government information, informs the public about responsive services, and dialogues with other members of Congress and constituents.

28.     Rep. Gosar has previously stated, "I've always encouraged Arizonans through the 4th Congressional District to join the conversation and be part of building a positive solution . . . . Town hall meetings and other public events hosted by my office are the best way to do that. Engagement with constituents in a civil manner helps me better represent Arizona in Congress and ensures that local priorities are given a voice in our nation's capital."[7]

29.     Facebook users with full access to Rep. Gosar's page may submit questions, request constituent services, participate in discussions with other Facebook users regarding the town halls, and leave comments or reactions after the town halls are completed.

30.     Rep. Gosar held Facebook Live events or town halls on April 11, 2016, March 6, 2017, April 26, 2017, May 4, 2017, June 28, 2017, July 12, 2017, July 19, 2017, July 25, 2017, August 17, 2017, September 6, 2017, September 12, 2017, September 27, 2017, October 11, 2017, October 25, 2017, November 8, 2017, and November 14, 2017. On at least four occasions, Rep. Gosar was joined by other members of Congress, including Congressman Jim

---

[7] Morgan Tanabe, *Arizona Rep. Paul Gosar cancels in-person town hall, sparks outrage among constituents*, ABC 15 (February 23, 2017), https://www.abc15.com/news/region-southeast-valley/apache-junction/arizona-rep-paul-gosar-cancels-in-person-town-hall-meeting-sparks-outrage-among-constituents.

Jordan on July 25, 2017, Congresswomen Jody Hice on September 6, 2017, Congressman Ken Buck on October 11, 2017, and Congressman Ron Estes on November 14, 2017.

31.    Over that same time span, Rep. Gosar held no in-person town halls. One of the few ways for constituents to engage meaningfully with Rep. Gosar is via his online Facebook Live events.

32.    Rep. Gosar utilizes his congressional staff to assist in moderating the Facebook Live forums. For example, during a Facebook town hall with Congressman Ron Estes on November 14, 2017, Rep. Gosar's press secretary, Faith C. Vander Voort, solicited questions from Facebook users.  Exhibit G.

33.    Upon information and belief, Ms. Vander Voort and other members of Rep. Gosar's congressional staff routinely moderate Rep. Gosar's town halls.

34.    Rep. Gosar's staff also routinely posts on Rep. Gosar's Facebook page. For example, on September 12, September 26, and November 1, 2017, Rep. Gosar's staff read offensive "tweets" directed at Rep. Gosar via social media.

35.    Upon information and belief, Rep. Gosar uses public money to maintain the public forums hosted on his social media accounts.

36.    In addition to hosting regular town halls on his Facebook page, Rep. Gosar posts about legislation and other government business directly related to his work as a congressman. Facebook users who are not blocked from Rep. Gosar's official Facebook page may post comments and reactions in response to his posts, or share Rep. Gosar's posts with other Facebook users.

37.    Rep. Gosar uses his Facebook page to inform constituents about his work in Congress. On November 30, 2017, Rep. Gosar posted his support for a House bill that would allow people to carry concealed weapons across state lines. Exhibit H. As of December 22, the post had received 423 reactions, 71 shares, and dozens of comments. On December 1, 2017, Rep. Gosar posted to his Facebook page, "[t]he House sent appropriations bills to the Senate 78 days ago . . . and we're still waiting for action. Senate, time to #DoYourJob." Exhibit I. As of December 22, the post had received 70 reactions, 27 shares, and over 15 comments.

38.     Rep. Gosar also uses his Facebook page to offer responsive services to constituents. For example, on November 17, 2017, Rep. Gosar posted an invitation to meet with his staff to raise concerns about federal and state issues and to request assistance with federal agencies such as the Department of Veteran Affairs and Social Security Administration. Exhibit J.

39.     Rep. Gosar also uses his Facebook page to inform constituents as to what issues or concerns he is focusing on. Rep. Gosar regularly posts his "first read of the day" highlighting a news story he considers important to read.

40.     Rep. Gosar has adopted and enforces a social media policy on "Congressmen Paul Gosar D.D.S." which establishes guidelines for constituents who wish to participate on Rep. Gosar's official Facebook page.  Exhibit K.  The policy is accessible on Rep. Gosar's Facebook page in the "About" section.[8]

41.     The policy states that Rep. Gosar's Facebook page is "a moderated online discussion site and not a public forum." Comments posted on Rep. Gosar's official congressional webpage are monitored and must comply with Facebook's and Rep. Gosar's terms of use.  Exhibit K.

42.     A government official creates a public forum by opening a traditionally nonpublic forum for public discourse or making a nonpublic forum generally available to a class of speakers. *See United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341 (6th Cir. 1998). A government official cannot avoid First Amendment scrutiny simply by declaring that a public forum is a nonpublic forum.

43.     Under Rep. Gosar's social media policy, Defendant reserves the right to censor and remove comments he or his staff believe are unrelated to the purpose of the Facebook page; are not topical; are false, indecent, vulgar or profane, fighting words, graphic or gratuitous violence, sexual, or commercial; are a solicitation of funds; misrepresent the commenter's identity or affiliation; contain links to any site; are repetitive or copy and paste

---

[8] *About section, Congressmen Paul Gosar D.D.S Facebook*, FACEBOOK.COM, https://www.facebook.com/pg/repgosar/about/?ref=page_internal (last visited April 9, 2018).

statements (spam); are intimidating, harassing, or defamatory; are campaign-related and/or electioneering. Exhibit K.[9]

44.     Defendant's social media policy does not define the broad, vague terms that it relies on. A commenter on Defendant's Facebook page has no meaningful way to assess whether a comment may cause Rep. Gosar to take adverse action against him or her. Rep. Gosar's social media policy is not narrowly drawn and prohibits far more speech than necessary to serve the purported interest of creating civil dialogue in a public forum. Indeed, in many ways the policy hampers informed dialogue.

45.     Violations of Rep. Gosar's social media policy may result in the permanent banning from public forums hosted on Defendant's Facebook page. Exhibit K.

46.     The purported criteria for deleting comments, marking comments as spam, and banning constituents from commenting in the public forum are broad, vague, and indeterminate, and fail to provide any meaningful limitation on the ability of Defendant or his staff to censor comments or block constituents who hold opposing viewpoints.

47.     Users who have their comments deleted or reported as spam are not given notice or any opportunity to contest the decision.

48.     Under Defendant's social media policy, blocked users are not notified of Rep. Gosar's decision to block them from participating in the public forums hosted on Rep. Gosar's official Facebook page. Blocked users are given no opportunity to contest or appeal the decision. There is no path for users to be unblocked from Rep. Gosar's official Facebook page. Blocked users may be permanently restricted from participating in public forums hosted on Rep. Gosar's Facebook page without process.

49.     Defendant's social media policy relies on broad, vague, and undefined terms, and permits the arbitrary censorship of views Rep. Gosar disfavors. The policy does not give Plaintiffs and similarly-situated constituents sufficient notice of which comments may be censored and lead to the indefinite suspension from a government-created public forum.

---

[9] *About section, Congressmen Paul Gosar D.D.S Facebook*, FACEBOOK.COM, https://www.facebook.com/pg/repgosar/about/?ref=page_internal (last visited April 9, 2018).

50.     Upon information and belief, Rep. Gosar has targeted, and continues to target, Facebook users who express opposing viewpoints for adverse action by marking critical comments as spam, thereby limiting those users' ability to fully participate in Rep. Gosar's online government-created public forums. Reporting a comment as spam triggers a response by Facebook that may lead to a user's comments being deleted and the user being suspended from the Facebook application.

51.     Rep. Gosar's social media policy, as well as Defendant's practice of deleting comments, reporting comments as spam, and blocking constituents, creates a hostile atmosphere for free expression on the public forums hosted on Defendant's Facebook page, chilling and deterring the protected expressive activities of Plaintiffs.

52.     Constituents who have been blocked from participating on Rep. Gosar's Facebook page are prevented from receiving the same access to public forums hosted by Rep. Gosar as unblocked users. Blocked users are prevented from participating in online town halls, reacting directly to Rep. Gosar's posts, dialoguing with fellow constituents, sharing Rep. Gosar's posts, following Rep. Gosar's page, or requesting constituent services.

53.     Constituents whose comments are deleted are prevented from engaging in informative dialogue with persons who visit Rep. Gosar's online public forums and expressing their political views to Rep. Gosar and the public.

54.     Constituents whose comments are reported as spam may have their comments deleted and their use of Facebook suspended, thereby restricting them from communicating with Rep. Gosar, other elected officials, family, and friends.

55.     Rep. Gosar's current social media policy, which allows him to censor and block constituents for First Amendment protected activities, and his continuing practice of taking adverse action against constituents who express dissenting views, chills Plaintiffs' right to expression in online, public forums hosted on Defendant's Facebook page.

56.     Rep. Gosar's Facebook page is a government-created public forum from which Defendant may not exclude constituents, or censor comments, on the basis of viewpoint. Rep.

11

Gosar's policies and practices chill dissent, impermissibly limit access to online public forums, and violate Plaintiffs' First Amendment rights.

### B. Defendant's Censorship of Plaintiffs' First Amendment Protected Speech.
#### a.      Plaintiff J'aime Morgaine

57.     Plaintiff Morgaine is a veteran of the United States Army and a founder of Indivisible Kingman. Ms. Morgaine resides within Arizona's fourth congressional district. Congressman Gosar is her elected representative.

58.     Indivisible is a national, progressive, grassroots organization, with individual local groups across the nation, dedicated to opposing President Donald Trump and his congressional supporters through local political action.[10] Indivisible members lobby their congressional representatives to oppose the Trump administration or to pressure their congressional representatives to support liberal or progressive policies.  Ms. Morgaine founded Indivisible Kingman so she could take a more active role in her community.

59.     Ms. Morgaine primarily communicates with elected officials, including Rep. Gosar, through Facebook.  After the 2016 election, Ms. Morgaine became a frequent commenter on Rep. Gosar's official Facebook page, often critical of his positions on various issues.

60.     Ms. Morgaine's comments on Rep. Gosar's official government Facebook page were made in reference to Rep. Gosar's performance as an elected official, issues before Congress, and matters of public concern.

61.     On February 9, 2017, Ms. Morgaine attempted to post a comment on Rep. Gosar's Facebook page, but discovered she could no longer do so. Ms. Morgaine also could not "like" or post reactions to Rep. Gosar's posts or follow his official Facebook feed in her own timeline.

62.     In addition, Ms. Morgaine discovered that every comment she had posted on Rep. Gosar's page in the past had been deleted. Ms. Morgaine soon realized that Rep. Gosar

---

[10] INDIVISIBLE (April 9, 2018), https://www.indivisible.org.

had blocked her from his Facebook page. With no notice or explanation, Ms. Morgaine's exercise of her First Amendment rights had been censored by Rep. Gosar.

63.     Ms. Morgaine was given no notice of the decision to block her from participating in the online public forum hosted on Rep. Gosar's Facebook page, no notice that her comments were being deleted, and no opportunity to contest either decision.

64.     After learning she was blocked, Ms. Morgaine sent an email to Rep. Gosar requesting to know why she had been blocked from commenting on his official Facebook page. Neither Rep. Gosar nor anyone from his office responded.

65.     Ms. Morgaine was confused and frustrated with Rep. Gosar's censorship and refusal to explain why she had been blocked from the public forums hosted on Rep. Gosar's Facebook page. On May 12, 2017, Ms. Morgaine began to protest Rep. Gosar's practices by delivering a single concrete block to Rep. Gosar's Prescott, Arizona office with the message "Please Stop Blocking Your Constituents."

66.     On May 17, Ms. Morgaine repeated her May 12 protest, this time delivering the block to Rep. Gosar's Assistant Office Manager, Jeremiah Cota.  Ms. Morgaine requested Rep. Gosar's social media policy and an opportunity to meet with Rep. Gosar to discuss why she was blocked from a government-created online public forum.  Mr. Cota informed Ms. Morgaine that Rep. Gosar does not meet directly with constituents.

67.     On May 22, Ms. Morgaine again repeated her block protest, delivering a block to Rep. Gosar's Prescott office. In response, Mr. Cota provided Ms. Morgaine a computer printout of the purported reasons Rep. Gosar blocks constituents.  The reasons included: engaging in hate speech; using profanity or racial slurs; showing intolerance; expressing anger or rage; homophobic or Islamophobic comments; and expressing treasonous or dangerous thoughts.

68.     After reviewing the list, Ms. Morgaine sent a letter to Rep. Gosar requesting more information about his social media policies and requested to learn how she and other constituents could regain their right to post in the public forum. Rep. Gosar's office did not respond to Ms. Morgaine's letter.

69.     Ms. Morgaine repeated her block protest again on May 26, May 31, and June 7, 2017. Soon thereafter, Rep. Gosar closed his Prescott office to the public and instituted an appointment-only policy. Beginning in August 2017, Ms. Morgaine started to submit symbolic blocks, pieces of paper that fit through a mail slot, to Rep. Gosar's Prescott office.

70.     On June 28, 2017, Rep. Gosar held a Facebook Live town hall. Questions for the town hall were solicited from Facebook. A comment section beneath the video town hall allowed Facebook users to react to the town hall, leave comments about the town hall, and dialogue with interested constituents.

71.     Due to Rep. Gosar's block, Ms. Morgaine was unable to submit questions to Rep. Gosar, post reactions, post comments, or dialogue with fellow constituents.

72.     On July 12, July 19, July 25, and September 6, 2017, Rep. Gosar held Facebook Live town halls. Ms. Morgaine was unable to submit questions to Rep. Gosar or post comments in response to the town halls.

73.     On July 26, 2017, Rep. Gosar held a telephone town hall. Questions for the town hall were solicited from Facebook. Ms. Morgaine was unable to submit questions to Rep. Gosar because Ms. Morgaine was blocked from his official Facebook page.

74.     On May 28, 2017,[11] and June 30, 2017,[12] the Kingman, Arizona newspaper the Daily Miner published letters to the editor from J'aime Morgaine concerning Rep. Gosar's continued blocking of her and other constituents from his official social media Facebook page.

75.     Rep. Gosar responded to Ms. Morgaine's letters in a July 7 Facebook post[13] and a July 9 article.[14] In the post and article, Rep. Gosar claimed that the First Amendment rights of the constituents he blocks are still "fully intact."

---

[11] J'aime Morgaine, *Representative Gosar is Betraying Our Constitution*, THE DAILY MINER (May 28 2017), https://kdminer.com/news/2017/may/28/letter-representative-gosar-betraying-our-constitu.

[12] J'aime Morgaine, *Gosar owes Constituents*, THE DAILY MINER (June 30, 2017), https://kdminer.com/news/2017/jun/30/letter-gosar-owes-constituents.

[13] Paul Gosar, *So you're upset I blocked you on Facebook. Here's why I don't care, a three-part series*, Congressman Paul Gosar D.D.S., FACEBOOK.COM (July 7, 2017), https://www.facebook.com/repgosar/posts/1576492332425679.

[14] Paul Gosar, *Gosar: I don't care if you're upset if I blocked you on Facebook*, THE DAILY MINER (July 9, 2017), https://kdminer.com/news/2017/jul/09/letter-i-dont-care-if-youre-upset-if-i-blocked-you.

76.     Rep. Gosar stated that his social media policies are "clear and lack any gray area whatsoever."[15] Rep. Gosar claims to block constituents "that [are] disrespectful to me or my staff with crude language or distasteful discourse." *Id.*

77.     In the article and Facebook post, Rep. Gosar claimed that persons may still "petition the government" by contacting his office or writing a letter. *Id.* Rep. Gosar also claimed that his Facebook page is his personal property and not subject to First Amendment restrictions. *Id.* Finally, Rep. Gosar invoked the shooting of U.S. Congressmen Steve Scalise as justification to block constituents. *Id.*

78.     On July 25 and August 2, 2017, Ms. Morgaine wrote letters to Rep. Gosar informing him about the decision in *Davidson v. Loudon County.*[16] Exhibit L; Exhibit M. The district court in *Davidson* held that a government official's ban of a constituent from their official social media account violated the First Amendment. Rep. Gosar did not respond to Ms. Morgaine's letters.

79.     On September 8, 2017, Rep. Gosar was interviewed by Vice News for a segment to air on HBO concerning his decision to block Ms. Morgaine and other constituents from participating on his Facebook page.

80.     During the interview, Rep. Gosar stated he blocked Ms. Morgaine because he "wanted to make sure you're not intimidating people, not using foul language, and that you're not threatening people." *Id.* Rep. Gosar stated that he has the right to block people from his official social media account because "it is my Facebook." *Id.*

81.     Rep. Gosar also claimed that Ms. Morgaine and other persons he blocked from Facebook were instigating violence. *Id.* When asked whether it was fair to equate a rude comment on Facebook with the attempted murder of a congressman, Rep. Gosar stated "[i]ntimidation by any shape or form from what I've seen and the definition of bullying, I think, words seem to hurt people these days. Violence cannot be tolerated." *Id.*

---

[15] Paul Gosar, *Gosar: I don't care if you're upset if I blocked you on Facebook*, THE DAILY MINER (July 9, 2017), https://kdminer.com/news/2017/jul/09/letter-i-dont-care-if-youre-upset-if-i-blocked-you.

[16] *Davison v. Loudoun Cty. Bd. of Supervisors*, 227 F. Supp. 3d 605, 607 (E.D. Va. 2017).

82.     Rep. Gosar uses claims of violent behavior as justification for censoring speakers and political viewpoints with which he disagrees.

83.     After Rep. Gosar's made additional comments suggesting that Ms. Morgaine was blocked because she had threatened his physical safety, Ms. Morgaine wrote Rep. Gosar a letter to object to the characterization. Exhibit N.

84.     In the letter Ms. Morgaine stated, "I have never made any threats against you personally, or against anyone associated with you. Every single action that I have taken since the moment I found myself blocked has been, and will continue to be, focused in the ISSUE of you BLOCKING me and denying my constitution guaranteed CIVIL LIBERTIES . . . And for you to imply otherwise is not just inappropriate, it is an unconscionable abuse of your power." *Id.* (emphasis in original).

85.     On October 5, and 6, 2017, two Arizona newspapers published stories about the dispute between Ms. Morgaine's and Rep. Gosar.[17]

86.     On October 6, 2017, HBO aired Vice News's September 8 interview with Rep. Gosar - "Meet the congressman who's blocking his constituents online."[18]

87.     Rep. Gosar's comments to Vice News about his Facebook page, the riots in Charlottesville, Virginia, George Soros, and the protestors received widespread condemnation.

88.     On October 11, after the negative press coverage, Rep. Gosar announced he was unblocking Ms. Morgaine and all other previously blocked constituents.[19]

89.     Rep. Gosar claimed he unblocked Ms. Morgaine and other constituents because "everyone deserves a second chance." *Id.* Rep. Gosar emphasized that his previous social

---

[17] Hubble Ray Smith, *J'aime Morgaine sues Rep. Paul Gosar; claims First Amendment rights Infringed*, THE DAILY MINER (October 5, 2017), https://kdminer.com/news/2017/oct/05/first-amendment-infringed; Hubble Ray Smith, *Rep. Gosar blocking former Prescott woman from Facebook page leads to lawsuit*, THE DAILY COURIER (October 6, 2017), https://www.dcourier.com/news/2017/oct/06/rep-gosar-blocking-former-prescott-woman-facebook-.

[18] Valerie Kipnis, *This Congressman avoids criticism by blocking voters on Facebook*, VICE NEWS (October 6, 2017), https://news.vice.com/en_us/article/kzgpaz/this-congressman-avoids-criticism-by-blocking-voters-on-facebook.

[19] *Arizona congressman unblocks woman on social media after lawsuit*, KTAR NEWS (October 11, 2017), http://ktar.com/story/1782071/arizona-congressman-unblocks-woman-social-media-lawsuti/?.

medial practices were still in effect and called on constituents to "honor our rules of conduct by abstaining from the use of profanity, ad hominem attacks, hate speech and spamming." *Id.*

90.    For eight months Ms. Morgaine was blocked from accessing public forums hosted on Rep. Gosar's Facebook page.

91.    Ms. Morgaine fears that Rep. Gosar will prevent her and other constituents from participating in public forums hosted on his Facebook page in the future. Rep. Gosar's current social media policy allows him to repeat his previous unlawful conduct of censoring Ms. Morgaine's comments and blocking her from expressing opposing or critical viewpoints.

92.    The broad, vague language of Rep. Gosar's social media policy prohibits Ms. Morgaine from engaging in speech protected by the First Amendment, such as endorsing candidates with viewpoints she supports or linking to internet sites with relevant information.

93.    Rep. Gosar's current policies and practices for public forums hosted on his official Facebook page chill Ms. Morgaine's and other constituents' rights to express opposing viewpoints, in violation of the First Amendment.

### b.    Plaintiff Paul Hamilton

94.    Plaintiff Paul Hamilton is a Shakespeare Fellow at Kingston University. Dr. Hamilton resides within Arizona's fourth congressional district and is a founder of the political group Indivisible Prescott. Rep. Gosar is Dr. Hamilton's elected representative. Dr. Hamilton founded Indivisible Prescott to place pressure on his federal representative to oppose the Trump agenda.

95.    Dr. Hamilton began posting on Rep. Gosar's Facebook page some time in 2013. Dr. Hamilton's decision to participate in the online public forum was motivated by a desire to enter into conversations with fellow constituents, to correct misleading or incorrect information provided to the public by Rep. Gosar, and to establish a dialogue within his community about issues of public concern.

96.    Dr. Hamilton believes it is important that opposing viewpoints are presented in public forums so that the public knows that rational persons can express differing opinion without hostility.

97.     Dr. Hamilton's comments on Rep. Gosar's Facebook page were made in reference to Rep. Gosar's performance as a congressional representative, issues before Congress, and matters of public concern.

98.     Dr. Hamilton believes that Rep. Gosar's Facebook posts are often filled with divisive rhetoric. For example, on April 10, 2014, Rep. Gosar posted a doctored photo of former President Barack Obama kissing former Secretary of Health and Human Services Kathleen Sebelius. Dr. Hamilton believed such posts attracted racist comments and expressed his objection. Exhibit O.

99.     Dr. Hamilton made a point to respond specifically to Rep. Gosar's posts, expressing his opinion, and often citing evidence from credible sources to support his view. Though often in disagreement with Rep. Gosar and others who posted in the public forums, Dr. Hamilton always maintained a respectful tone.  Exhibit P.

100.     Dr. Hamilton regards the use of profanity, threats, or speaking off-topic as counter-productive to his goal of educating, informing, and persuading. As such, he made a point not to engage in those behaviors in the public forums hosted on Rep. Gosar's Facebook page, even when such language was directed at him.

101.     Dr. Hamilton's comments were usually adverse to Rep. Gosar, but he made a point to express agreement or approval when Rep. Gosar held a position he supports. Exhibit Q.

102.     Dr. Hamilton's direct interactions with Rep. Gosar in the public forums were often cordial. Exhibit R.

103.     Perhaps because Dr. Hamilton was attending school at the University of Birmingham in London, England, at the time, Dr. Hamilton was accused by another poster of being a plant who was in the public forum specifically to undermine Rep. Gosar and disrupt dialogue.

104.     Defendant's social media policy does not forbid constituents temporarily residing outside of the fourth congressional district of Arizona from commenting on Rep. Gosar's official Facebook page.

105.     Dr. Hamilton maintained a residence in Prescott, Arizona, while pursuing his doctorate at the Shakespeare Institute at the University of Birmingham in the United Kingdom, often returning home for extended periods. Dr. Hamilton chooses to reside in Prescott, Arizona, because his mother made it her full-time home in 2011.

106.     In May 2014, after being accused by another poster of being a plant, Dr. Hamilton discovered that he had been blocked from participating in public forums hosted on Rep. Gosar's Facebook page.

107.     Due to Rep. Gosar's block, Dr. Hamilton could not comment on Rep. Gosar's post, follow his official congressional Facebook page, dialogue with other constituents in the public forums hosted on Rep. Gosar's official Facebook page, participate in public town halls hosted on Rep. Gosar's page, or share Rep. Gosar's post with his followers.

108.     In addition, Dr. Hamilton's previous comments and posts were censored, preventing other Facebook users from reading or commenting upon them.

109.     Over the next three years, Dr. Hamilton made several attempts to discover why he had been blocked from the public forums hosted on Rep. Gosar's Facebook page and sought to be reinstated.

110.     On February 15, 2016, Dr. Hamilton visited Rep. Gosar's Prescott office to request a meeting to discuss issues of concern to Indivisible Prescott and why he had been blocked from Rep. Gosar's Facebook page. Rep. Gosar never responded to Dr. Hamilton's request for a meeting.

111.     On February 27, 2016, August 7, 2016, June 17, 2017, and July 31, 2017, Dr. Hamilton used the online form on Rep. Paul Gosar's official congressional website to request that he be allowed to participate in online public forums hosted on Rep. Gosar's social media platforms. Exhibit D. Rep. Gosar did not respond to Dr. Hamilton's requests.

112.     On July 30, 2017, The Daily Courier published a letter from Dr. Hamilton responding to Rep. Gosar's statements in support of blocking constituents from accessing public forums hosted on Rep. Gosar's official Facebook page.[20]

---

[20] Paul Hamilton,, *Unblock People*, THE DAILY COURIER (July 30, 2017),

113.    Dr. Hamilton argued that he and others had not been blocked because they "spew hateful comments" as Rep. Gosar had claimed, but because they "simply disagree with him on some issues." *Id.* Dr. Hamilton noted that "Rep. Gosar has created a social media echo-chamber which deprives community members of the opportunity to engage in constructive disagreement." *Id.* Rep. Gosar did not respond to Dr. Hamilton's letter.

114.    In addition to the above efforts, Dr. Hamilton also made phone calls and sent letters to Rep. Gosar's office seeking an explanation for why he was blocked and seeking to be reinstated so he could participate in the public forums hosted on Rep. Gosar's Facebook page in the future. Rep. Gosar never responded to Dr. Hamilton's inquiries.

115.    On February 23, 2017, Dr. Hamilton and about 45 other constituents of Rep. Gosar chartered a bus from Prescott, Arizona, to Gold Canyon, Arizona, to attend a public in-person town hall being held by Rep. Gosar. However, Rep. Gosar abruptly cancelled the town hall when he learned the group was planning to attend.[21]

116.    Instead, Rep. Gosar held a telephone town hall with questions submitted via Facebook. *Id.* Dr. Hamilton was excluded from participating in the telephone town hall because he was blocked from communicating with Rep. Gosar on Facebook. During the call, several members of Indivisible Prescott attempted to ask questions. However, Rep. Gosar took no questions from opponents of his policies or positions.

117.    After cancelling the February 23 in-person town hall, Rep. Gosar held no more in-person town halls in 2017. However, Rep. Gosar did hold several online town hall sessions on Facebook Live, advertised as being open to the public.

118.    As a blocked constituent, Dr. Hamilton could not participate in the online town halls on Rep. Gosar's official Facebook page. Dr. Hamilton could not submit questions to Rep. Gosar, leave comments under Rep. Gosar's Facebook town hall videos, dialogue with fellow

---

https://www.dcourier.com/news/2017/jul/30/letter-unblock-people.

[21] Morgan Tanabe, *Arizona Rep. Paul Gosar cancels in-person town hall, sparks outrage among constituents,* ABC 15 (February 23, 2017), https://www.abc15.com/news/region-southeast-valley/apache-junction/arizona-rep-paul-gosar-cancels-in-person-town-hall-meeting-sparks-outrage-among-constituents.

constituents, or express his opposition or support for any of the opinions expressed by Rep. Gosar.

119.   On October 11, Mr.  Hamilton and other previously blocked constituents were unblocked from Rep. Gosar's Facebook page.

120.   For thirty-eight months Dr. Hamilton was blocked from participating in public forums hosted on Rep. Gosar's Facebook page. The block prevented Dr. Hamilton from engaging in expressive activity in the public online forums hosted on Rep. Gosar's Facebook page, in violation of Dr. Hamilton's First Amendment rights.

121.   Dr. Hamilton fears that Rep. Gosar will prevent him and other constituents from participating in public forums hosted on Defendant's Facebook page in the future, and censor or block him and other constituents who express opposing or critical viewpoints unless the court intervenes. Rep. Gosar's current social media policy allows him to repeat his previous unlawful conduct of censoring Dr. Hamilton's comments and blocking him from expressing opposing or critical viewpoints.

122.   The broad, vague language of Rep. Gosar's social media policy prohibits Dr. Hamilton from engaging in speech protected by the First Amendment, such as endorsing candidates with viewpoints he supports or providing links to internet sites that may have relevant information.

123.   Rep. Gosar's current policies and practices for public forums hosted on his official Facebook account chill Dr. Hamilton's and other constituents' rights to express opposing viewpoints, in violation of the First Amendment.

### C. Rep. Gosar's Social Media Policy and Practices Continue to Violate and Chill Plaintiffs' Exercise of their First Amendment Rights.

124.   Rep. Gosar's social media policy allows him to censor and block constituents that are critical of his political views. In the past, Rep. Gosar has blocked "several hundred" Facebook users from participating on his page, and Rep. Gosar's press secretary states that his office has "no problem blocking people who don't adhere to our policies."[22]

---

[22] Bob Christie, *Rep. Gosar tells blocked Facebook followers 'I don't care'*, ASSOCIATED PRESS NEWS (July 10, 2017), https://apnews.com/7806141af7754e0ea2e6cb9ee621b9e9.

125.    By blocking Plaintiffs and censoring their comments, Rep. Gosar has infringed on Plaintiffs' First Amendment right to: engage in political speech in a public forum, petition the government for redress and services, receive information that is generally available to the public, and dialogue in a public forum free of government censorship.

126.    Upon information and belief, even after unblocking hundreds of users, Rep. Gosar continues to take adverse action against users for their First Amendment protected expressive activities in public forums hosted on his Facebook page.

127.    Defendant's voluntary, temporary cessation of a small part of his unlawful conduct does not ease Plaintiffs' fears that Defendant will violate Plaintiffs' First Amendment rights in the future because Defendant's social media policy still allows him to ban users from, and censor comments in, public forums hosted on Defendant's Facebook page.

128.    The broad and vague language of Rep. Gosar's current social media policy creates the strong likelihood that Rep. Gosar will repeat his previous unlawful conduct of censoring and blocking Plaintiffs, and other constituents critical of his political views. For example, the current social media policy prohibits posting links to other websites and campaign-related communications. Both are activities Plaintiffs engaged in before Rep. Gosar blocked them, and both are activities Plaintiffs intend to continue in the future. Under Rep. Gosar's current social media policy, both activities will lead to Plaintiffs' comments being censored and could lead to their permanent ban from the public forums hosted on Rep. Gosar's Facebook page.

129.    When government officials ban critics from speaking in online public forums or delete comments with which they do not agree, they silence and chill dissent, warp the public conversation, and skew public perception. When only critics are blocked from viewing information, participating in public forums, or petitioning the government for redress or services, the restrictions operate as a punishment for holding political viewpoints that government officials disfavor.

130.    Rep. Gosar's policies and practices continue to chill and infringe upon Plaintiffs' right to engage in protected speech in online public forums hosted on Defendant's Facebook

page. Rep. Gosar's social media policy still allows him to censor comments and block users who express opposing viewpoints.

131.    Unless the court intervenes, Rep. Gosar will continue to censor critical or dissenting comments and block constituents who express viewpoints with which he does not agree. Judicial intervention is required to end Defendant's ongoing interference with Plaintiffs' and the public's First Amendment rights and to stop ongoing harms to Plaintiffs resulting from Defendant's First and Fifth Amendment violations. Plaintiffs are entitled to a declaration of rights with respect to this controversy and an injunction preventing Defendant from continuing his unconstitutional policies and practices.

## VI.          CAUSES OF ACTION

**Count I: Unlawful Infringement on Plaintiffs' Right to Free Speech in a Public Forum**

132.    Plaintiffs re-allege and incorporate by reference the allegations in all preceding paragraphs of the Complaint.

133.    Rep. Gosar blocked Plaintiffs and censored their comments for persistently expressing views critical of his politics or actions as an elected official. Rep. Gosar's social media policies and practices afford him and his staff an impermissible degree of discretion to censor comments and block constituents who express critical or dissenting viewpoints in online public forums.

134.    The First Amendment to the United States Constitution prohibits infringement on, and chilling of, protected First Amendment activity. Speech utilizing Facebook and other social media is subject to the same First Amendment protections as any other speech. *Packingham v. North Carolina*, 137 S. Ct. 1730 (2017).

135.    By blocking Plaintiffs and censoring their comments, Rep. Gosar has both directly and implicitly chilled Plaintiffs' free expression, as well as that of all residents of Arizona's fourth congressional district.

136.    Rep. Gosar continues to infringe upon, restrict, and violate Plaintiffs' First Amendment rights because Plaintiffs' speech remains chilled by Congressman Gosar's continuing policies and practices.

**Count II: Facial Challenge to Rep. Gosar's Social Media Policy.**

137.    Plaintiffs re-allege and incorporate by reference the allegations in all preceding paragraphs of the Complaint.

138.    Rep. Gosar's social media policy is overly broad and vague. The policy seeks to prohibit speech that contains false, non-topical, vulgar, repetitive, intimidating, profane, defamatory, campaign-related, and/or electioneering communications without providing any standard for defining those terms or assessing how the comment will be moderated. The criteria for deleting comments and blocking constituents are so broad and vague they do not provide any meaningful limitation on Rep. Gosar's ability to censor comments or constituents with whom he disagrees. Under the policy's plain language, speech that is clearly protected under the First Amendment may be subject to adverse action.

139.    The First Amendment does not permit the government to subject speech to overly broad regulation. *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). By subjecting speech to review and censorship based on such expansive terms, Rep. Gosar's social media policy stifles expression and disregards the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

140.    Rep. Gosar's social media policy is overbroad, does not serve a significant or compelling government interest, is not narrowly tailored, and impermissibly restricts expression. The policy burdens far more speech than is necessary to serve the asserted interest of providing an opportunity for constituents to interact civilly with Rep. Gosar and other constituents in online public forums.

141.    As a direct result of Rep. Gosar's social media policy, Plaintiffs' speech is chilled and infringed upon in public forums hosted on Rep. Gosar's Facebook page in violation of the First Amendment to the United States Constitution.

**Count III: Violation of Plaintiffs' Due Process Rights under the Fifth Amendment**

142.    Plaintiffs re-allege and incorporate by reference the allegations in all preceding paragraphs of the Complaint.

143.    Rep. Gosar blocked Plaintiffs from commenting on his Facebook page, participating in online town halls, and being part of an expressive community forum without notice, and based upon an arbitrary and vague standard. Plaintiffs were not provided any avenue to contest or appeal the decision. Rep. Gosar repeatedly refused to respond to Plaintiffs' inquiries concerning how they may regain their right to participate in the public forums hosted on Defendant's official Facebook page. Rep. Gosar provided Plaintiffs with no notice or process at all before denying Plaintiffs the opportunity to exercise their First Amendment rights in online public forums.

144.    Rep. Gosar's decisions to censor Plaintiffs comments and ban Plaintiffs from participating in the online public forum hosted on his official Facebook page come with no prior notice, warning, or opportunity to be heard, and no avenue for appeal, in violation of the Due Process Clause of the Fifth Amendment.

145.    The social media policy is also unconstitutionally vague in violation of the due process guarantee of the Fifth Amendment, because the prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion. *United States v. Wunsch*, 84 F.3d 1110, 1119 (9th Cir. 1996). The social media policy does not define the nebulous terms that it contains that may form the basis of a decision by Rep. Gosar or his staff to restrict speech, encouraging subjective enforcement and chilling Plaintiffs' First Amendment freedoms. *Id.* The terms of the social media policy are generalized, subjective, and incapable of precise definition or application.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendant, and award the following relief:

A.    Permanently enjoin Defendant, his officers, agents, servants, and employees from preventing, restricting, impeding, or otherwise interfering with Plaintiffs' First Amendment rights to participate in public forums hosted on Congressman Gosar's Facebook page "Congressmen Paul Gosar, D.D.S.";

B.   Permanently enjoin Defendant his officers, agents, servants, and employees from deleting, censoring, or hiding comments made by Plaintiffs in exercise of their First Amendment rights on Congressman Gosar's Facebook page "Congressmen Paul Gosar, D.D.S." under the current social media policy;

C.   Declare that Defendant's social media policy violates the First Amendment of the United States Constitution on its face;

D.   Declare that Defendant's practices violate the First and Fifth Amendments of the United States Constitution as applied to Plaintiffs;

E.   Award Plaintiffs their costs and reasonable attorneys' fees in this action;

F.   Grant Plaintiffs such other relief as this Court may deem just and proper.

Dated this 10th day of April, 2018.

By: /s/ *Darrell L. Hill*
Kathleen E. Brody
Darrell L. Hill
ACLU Foundation of Arizona
3707 North 7th Street, Suite 235
Phoenix, AZ 85014

Daniel C. Barr
Alexis E. Danneman
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788

*Attorneys for Plaintiffs*